UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

**ANNIE WALLEN**,

   Plaintiff,

v.

**CITY OF JACKSON,
CHIEF DAVID WOODEN,
CHIEF TIMOTHY GONZALES,
and DIRECTOR ELMER HITT,**
in their personal and official
Capacities,

   Defendants.

File No. 2:24-CV-

Hon.

_____

# COMPLAINT AND JURY DEMAND
_____

### Complaint

Plaintiff Annie Wallen, by and through her attorneys, Pinsky Smith, PC, states as follows:

### Jurisdiction, Venue, and Parties

1. This is an action requesting that the Court remedy violations of the Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* and factually related violations of the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.*

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

3. Plaintiff, Annie Wallen, is a resident of Jackson County, Michigan, and of the Eastern District of Michigan, Southern Division.

4. Defendant City of Jackson ("the City") is a local unit of government organized pursuant to the laws of the state of Michigan in Jackson County, Michigan; a state actor; and was Plaintiff's employer at all times relevant to this Complaint.

5. Defendant Deputy Chief David Wooden was the City of Jackson Deputy Fire Chief until April of 2023. Upon information and belief, Defendant Chief Wooden is a resident of Jackson County, Michigan.

6. Defendant Deputy Chief Timothy Gonzales is the current City of Jackson Deputy Fire Chief. Upon information and belief, Defendant Chief Gonzales is a resident of Jackson County, Michigan.

7. Defendant Director Elmer Hitt is a male and is the Director of Police and Fire Services for Defendant City of Jackson. Upon information and belief, Defendant Hitt is a resident of Jackson County, Michigan.

8. Defendants were Plaintiff's employers as defined by Title VII and ELCRA.

9. Venue is proper within this judicial district under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

10. Defendant City hired Wallen through a federal Staffing for Adequate Fire and Emergency Response ("SAFER") Grant in January of 2019, which was a program intended to provide cities like Defendant with additional funds to hire more firefighters for their fire departments.

11. Wallen was the City of Jackson Fire Department's ("the Department") first female firefighter. She remains the Department's only female firefighter.

12. From the very first day of her employment, Wallen felt the negative effects of being the first and only woman firefighter for the Department.

### A. *The City's Failure to Provide Adequate Firefighting Gear and Uniforms*

13. Despite knowing about her hiring for months, the Department did nothing to prepare for Wallen's arrival.

14. The Department provided all male firefighters will gear, but it failed to have anything that would fit a woman's size.

15. Because Wallen had been hired on the SAFER Grant, the Department did not want to waste time or money buying gear specific to fit her unless or until she was able to prove her abilities, and the Department hired her on permanently.

16. Firefighting gear, particularly the structural gear like pants and coats, are tailored for individual firefighters, and having properly fitting gear is important for safety and efficiency.

17. The Department provided the firefighters with other crucial, protective gear, such as boots, gloves, and a facemask.

18. Unlike the male firefighters, whom the Department provided gear that reasonable fit and would protect them in a fire, everything the Department give to Wallen was far too big for her, putting her in a dangerous position.

19. As a result, Wallen had to scrounge to get her own gear from other departments. The City was aware of this, and even one of the assistant chiefs tried to help contacting other departments to borrow gear.

20. While on a call, Wallen's boots were so big that a captain from Summit Township (a neighboring department) noticed and provided Wallen a smaller pair from his department. These boots were still too big, but they were at least wearable.

21. Wallen borrowed gear from other departments. She obtained gloves from Columbia Township and a smaller facemask from Spring Arbor.

22. The Department did not provide Wallen with appropriate firefighting gear that fit her for nearly a year and a half.

23. The Department also provided the male firefighters with a ceremonial uniform for formal events.

24. But the Department did not provide Wallen with one, so that when all her male counterparts were in ceremonial pants and jackets, Wallen had to attend in an evening gown instead.

25. The Department eventually provided Wallen with a ceremonial uniform, two and a half years later.

B. *The City's Failure to Provide a Safe, Private Shower, or Changing Facility*

26. During her employment with Defendant City, Wallen was never

provided a safe, private place to change and shower.

27. During the time she was employed with the Department, there were two locker rooms. Firefighters were assigned to one of the two locker rooms.

28. The main locker room housed most of the lockers and a large shower room, with multiple showerheads in one large area. Four or even five firefighters could shower next to each other with no barriers between showerheads or stalls. Most of the firefighters were assigned to this room.

29. The other/secondary locker room had fewer lockers and only one shower. This area also housed the Department's gym for many years (during most of Wallen's years with the Department).

30. There were three doorways to this locker room: one from the back of the captain's dorm, one into an office space, and one hallway. There was no separate door to the shower area. None of these doors locked during Wallen's employment, nor were there any blinds to cover the windows either.

31. Neither of the locker rooms were designated for women.

32. The Department assigned Wallen to the secondary locker room.

33. Wallen asked for a private place to change and shower repeatedly. At a minimum, she talked with Captains Joe Smith and Bob Walkowics and Chief Ermetanger. She was always told a fix "wasn't in the budget."

34. For the first six months of employment, Wallen changed clothes in a janitor's closet.

35. When she finally did change in her assigned locker room, the other

men in the Department constantly walked in on her to use the gym, access another area, or even to use the lockers (since she was not the only firefighter assigned to that room). Because there were no locks on the doors, she had no way of retaining any privacy for herself. In fact, there were never any locks on any doors in this space throughout her entire employment.

36. The secondary locker room's shower also did not work until July of 2022-- nearly three and a half years after Wallen started working for the Department. This meant Wallen still had to shower in the primary locker room with the shower room, where the men showered in groups.

37. Since she was the only woman and unwilling to shower alongside the men in an open shower room, this meant that she had to take the first or last shower separately from the men. Because of her rank, and the fact that she'd have to monopolize the area from all the other men (who could shower 4 or 5 at a time), she was almost always the last to shower.

38. Because women firefighters have higher rates of cancers from the carcinogen exposure during fires, forcing her to wait hours (sometimes up to an entire shift) for the last shower was not only unfair, but it also put her at a greater risk than her male counterparts.

39. There was also no lock to the door for the primary locker either at first. Wallen would use scotch tape across the door to let others know she was using the space. Eventually the Department purchased a lock, but still, locking it would

prevent anyone else from accessing the entire locker room and shower area.

40. The very few times Wallen did lock the door to the main locker room so she could shower privately, other male firefighters would bang on the door until she finished, pressuring her to rush as quickly as possible.

41. Worse, the City left her to fend for herself with these issues as there was no discussion, no plan, and no agreement as to how she was supposed to have equal accommodations in an unsustainable situation.

### C. *Inadequate Sleeping Quarters and Frat-Like Atmosphere*

42. Wallen never had appropriate sleeping quarters either, and the Department did nothing to provide her with any level of privacy.

43. The firefighters slept in a large room with no barriers or distinction for genders.

44. Many of the men slept minimally clothed and without any regard to having a woman in the same dorm.

45. Wallen has been told (and she believes it is true) that someone even urinated on her bed. There are also rumors that the incident was videotaped.

46. In a meeting with Defendant Hitt, he admitted knowledge about this incident where someone in the Department urinated on her bed, or at least the rumors about it happening.

47. There were porn stashes in the dorms where she and the rest of the firefighters slept.

48. In another incident, a fellow firefighter placed the resuscitation

mannequin dummies as if they were performing a sex act, where Wallen would be forced to see them.

49. There was a group communication channel that documented extensive derogatory comments and acts pertaining to women. For instance, Lieutenant Shane Green took the entire B shift as a group to the strip club and shared a video of one of the probationary firefighters performing a sex act on one of the female dancers.

50. Plaintiff was also told about the penis-measuring contests that happened in the showers and dorms.

51. The frat-boy like atmosphere which Defendants permitted to exist made it impossible for Wallen (or any other woman) to ever feel comfortable and accepted at the Department.

52. Defendants did nothing to prevent a variety of elements of a sexually-hostile, unprofessional working environment to exist.

53. Wallen wanted to fit in. She wanted her colleagues to be like her brothers, and sometimes she reported it as such because she so desperately wanted it to be true. And with a handful of them, it was. But a handful of respectful, inclusive, mature firefighters who treated her like an equal wasn't enough to overcome the consistent, perpetual discrimination and harassment she received from the rest—including leadership.

54. Wallen did everything she could to become part of this group, but it was impossible in this hostile environment.

### D. *Other Incidents of Sexism, Assault by then-Chief Defendant Wooden*

55. The discrimination and harassment Wallen experienced increased during her time with the Department, no matter what she did, even after switching shifts multiple times.

56. For example, in or around March of 2021, then-Chief Defendant Dave Wooden physically assaulted Wallen. One day in the Department kitchen, he came up behind her, grabbed her ponytail, yanked her head back and pulling her body into his. She pulled away, turned around and demanded that he stop, and he walked away.

57. Having initially started on A shift, Wallen transferred to B shift in early 2022, which is when the discrimination and harassment from fellow firefighters escalated significantly.

58. Some of the leaders on B shift, including Lieutenant Josh Gonzales, on this shift made it clear they didn't believe women belonged in the Department and he was out to prove this with Wallen.

59. Others in the Department have indicated to Plaintiff that Defendant Chief Gonzales also doesn't believe that women belong in the Department.

60. During her employment, fellow firefighters called Wallen names in a derogatory manner like bitch, dyke, and lesbian. Jokes were made about her being "on the rag" and not wanting to hire another woman because their menstrual cycles would "sync up."

61. The Department assigned gender-stereotypical tasks to Wallen, like

cleaning bathrooms—including the men's bathrooms and areas she never used.

62. Fellow firefighters also created and spread gender-based lies about her without repercussion from management. For example, in or around October of 2022, someone started a rumor that she was exchanging free fire extinguisher checks for free haircuts at a local hair salon. An investigation revealed the perpetrator of these lies to be Fire Inspector Tyler Whitehead, but the Department did nothing to reprimand him for this.

### E. *Plaintiff's Complaints and Constructive Termination*

63. In or around October of 2022, Wallen followed the chain of command to report incidents of harassment and discrimination, but nothing changed.

64. On October 31, 2022, Wallen left work early from a shift, feeling sick and overwhelmed with the discrimination and harassment she'd been receiving.

65. Instead of responding appropriately to Wallen's reports of harassment and discrimination, Defendants characterized the struggles she faced as her mental health problems. For some time, Defendants gaslighted her into thinking the problem was her and that she was not a good fit, instead of the constant discrimination and harassment she was receiving.

66. On November 18, 2022, Wallen put in her notice to resign because she could no longer endure working in the Department.

## COUNT I – Violation of Title VII of the Civil Rights Act of 1964 – Gender Discrimination, Sexual Harassment, Hostile Working Environment, and Retaliation

67. Plaintiff incorporates the allegations of all prior paragraphs as if set forth herein.

68. Defendants violated 42 U.S.C. §§ 2000e–2 and 2000e–3 when they discriminated against and harassed Plaintiff on account of gender, failed to provide an adequate remedy for her complaints of gender discrimination and harassment, maintained a hostile working environment ultimately intolerable for any female, and constructively terminated her on account of her gender and in retaliation for her complaints of the gender discrimination and harassment.

69. As a result, Plaintiff lost earnings, benefits (including future earnings and benefits), and suffered emotional distress, reputational damage and harm to her career, as well as incurred attorney fees, for which Defendants are liable.

**WHEREFORE**, Plaintiff requests that the Court grant her judgment against Defendants including the following relief:

(1) an award of lost wages and benefits;

(2) an award of future loss wages and benefits;

(3) appropriate, remedial injunctive relief;

(4) reinstatement to her job position;

(5) compensatory damages for emotional and mental distress;

(6) punitive damages in an amount as determined by a jury; plus

(7) interest and costs, including reasonable attorney's fees, and any other relief deemed necessary and proper by the Court.

## COUNT II –Violation of the Elliott-Larsen Civil Rights Act – Sex Discrimination and Retaliation

70. Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

71. Defendants violated the Elliott-Larsen Civil Rights Act ("ELCRA"), specifically sections 202 and 701, Mich. Comp. Laws §§ 37.2202 and 37.2701 respectively, when they discriminated against and harassed Plaintiffs on account of gender, failed to provide an adequate remedy for her complaints of gender discrimination and harassment, and terminated her on account of her gender and/or in retaliation for her complaints of the gender discrimination and harassment.

72. As a result, Plaintiff lost earnings, benefits (including future earnings and benefits), and suffered emotional distress, reputational damage and harm to her career, as well as incurred attorney fees, for which Defendants are liable.

**WHEREFORE**, Plaintiff requests that the Court grant her judgment against Defendants including the following relief:

(1) an award of lost wages and benefits;

(2) an award of future loss wages and benefits;

(3) appropriate, remedial injunctive relief;

(4) reinstatement to her job position;

(5) compensatory damages for emotional and mental distress;

(6) punitive damages in an amount as determined by a jury; plus

(7) interest and costs, including reasonable attorney's fees pursuant, and any other relief deemed necessary and proper by the Court.

PINSKY SMITH, PC
Attorneys for Plaintiff Annie Wallen

Dated: November 21, 2024          By:/s/ *Sarah R. Howard*
                                  Sarah Riley Howard
                                  Crystal Bultje (admission pending)
                                  146 Monroe Center St NW, Suite 418
                                  Grand Rapids, MI 49503
                                  (616) 451-8496

## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth above, Plaintiff hereby demands same.

                              PINSKY SMITH, PC
                              Attorneys for Plaintiff Annie Wallen

Dated: November 21, 2024         By:/s/ *Sarah R. Howard*
                              Sarah Riley Howard
                              Crystal Bultje (admission pending)
                              146 Monroe Center St NW, Suite 418
                              Grand Rapids, MI 49503
                              (616) 451-8496